UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-cv-11119-RGS

JAMES AMPE

v.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al.

MEMORANDUM AND ORDER ON JAMES AMPE'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR JUDGMENT ON THE RECORD

October 17, 2018

STEARNS, D.J.

Plaintiff James Ampe moves for summary judgment following a rejection of his application for long-term disability (LTD) benefits. This court has jurisdiction under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132. Defendants Prudential Insurance Company of America (Prudential), Massachusetts Institute of Technology (MIT), and the MIT LTD Plan (collectively defendants), cross-move for a brevis disposition. Because I find that defendants abused their discretion by failing to adequately consider or address Ampe's evidence of mental disability, the cross-motions will be denied and the case remanded to defendants for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

Ampe is a 53-year-old electrical engineer who worked as a Senior Development and Test Engineer for MIT Lincoln Laboratories from 2008 to January 26, 2015.[1] The duties of Ampe's position included frequent interactions with clients as well the duties ordinarily attendant to those of an electrical engineer.

In August of 2011, Ampe fell and struck his head in the bathroom of his home. Following the accident, Ampe complained of cognitive fatigue, difficulty concentrating, and an inability to focus in a noisy environment. In September and October of 2012, Ampe presented to Dr. Sheba Khumbani, a neurologist, for testing. Dr. Khumbani found that, while Ampe was "functioning in the average range for verbal abilities and in the very superior range for visual-spatial skills," R. at 896, he had "experienced a significant decline since the possible concussion and his residual symptoms, including physical, cognitive, and emotional/behavioral changes, are consistent with what is often seen in post-concussive syndrome." R. at 897.[2]

---

[1] To cite the record, defendants use the terminology (PRU) and plaintiff uses the terminology (AR). Each follows the term with the last three numbers of the full page number. For consistency, this opinion uses R. at ___, followed by the Bates Numbers.

[2] Dr. Khumbani's medical diagnosis was Cognitive Disorder Not Otherwise Specified: DSM-IV 294.9.

2

Despite the diagnosis, Ampe continued to work, taking intermittent FMLA leave. His annual performance reviews, however, deteriorated markedly over time. Following the 2014 review, which was the worst that Ampe had ever received, MIT informed him that it would provide no further accommodations and recommended that he apply for LTD benefits. Ampe did so on February 14, 2015.

> MIT's LTD Plan, under which Ampe was covered, provided:
>
> You will be considered totally disabled if you are prevented by bodily injury, sickness, disease, or mental disorder from engaging in your *own* occupation. After the first 24 months, you will be considered totally disabled *only if* you are prevented by bodily injury, sickness, disease, or mental disorder from engaging in *any* occupation for which you are reasonably fitted by education, training, or experience.

R. at 715 (emphasis in original).[3]

In assembling his LTD claim, Ampe relied on the diagnosis of his treating physician, Dr. Seth Herman. According to Dr. Herman, Ampe had

---

[3] MIT is self-insured. MIT delegates the evaluation of disability claims to Prudential, but retains the right to make the ultimate eligibility determination. The LTD Summary Plan Description provides that "[a]s Plan Administrator, MIT has complete discretionary authority with regard to the operation, administration, and interpretation of the Plan." R. at 719. Given this language, it is beyond dispute that the arbitrary and capricious standard of review applies to MIT's decision to deny Ampe LTD benefits. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Leahy v. Raytheon Co.,* 315 F.3d 11, 19 (1st Cir. 2002).

suffered a traumatic brain injury in 2011 and "continues to be limited by post brain injury symptoms especially dizziness, fatigue, headache, nausea, confusion, [*sic*] irritability. He is not able to tolerate work and 32 hours or more of work is not medically feasible." R. at 737. Turning to Ampe's prognosis, Dr. Herman opined:

> Mr. Ampe's post-concussion syndrome symptoms and condition are causally related to his fall on 8/29/2011 . . . . Some patients never return to [*sic*] prior level of functioning. What we do know is that up to 5 to 15% continue to suffer persistent post concussions symptoms.

*Id.*

On April 27, 2015, Dr. Rajesh Wadhwa, Prudential's Vice President and Medical Director, rejected Ampe's claim after reviewing Dr. Herman's report, the vestibular therapy records of Janet Callahan (a Massachusetts General Hospital physical therapist), Dr. Khumbani's 2012 evaluation, and quality-of-life correspondence between Ampe and his wife. Dr. Wadhwa faulted Dr. Khumbani's diagnosis principally because of her failure to perform "validity testing."[4] R. at 1359. He also dismissed Dr. Herman's report and the physical therapy records as "not relevant and current." *Id.* He recommended, however, that Prudential "please consider [a] fresh

---

[4] Validity testing generally refers to control measures that ensure that a psychological test is accurately measuring what it is supposed to be testing.

4

neuropsychiatric IME." R. at 1359. When MIT refused to pay for the IME, Ampe volunteered to subsidize the cost. The offer was refused.

On May 11, 2015, Prudential rejected Ampe's claim. In a letter explaining the denial to Ampe, Prudential noted that, while it had considered Dr. Herman's report, "corresponding medical records have not been provided for our review to assess how you present upon clinical examination." R. at 1274. The denial letter repeated Dr. Wadhwa's conclusions, stating that Dr. Khumbani's testing results and the physical therapy notes "[did] not support a current cognitive impairment." In an apparent reference to Dr. Khumbani's report, Prudential stated that she did "not provide validity testing and [did] not provide us with an understanding of your current cognitive level of function as it was conducted over 2 years prior to when you went out of work on February 1, 2015." R. at 1274.

On October 18, 2015, the Social Security Administration (SSA) determined that Ampe was disabled and awarded him benefits as of January 31, 2015. In reaching its disability decision, the SSA relied on the findings of Dr. Albert Berkowitz who, based on a physical examination, opined that Ampe suffered from Axis I "298.80 Anxiety Disorder, related to a physical/medical condition." R. at 1040. Dr. Berkowitz further determined that Ampe showed signs of cognitive limitation, among them an inability "to

hold information in [his] mind while using it to resolve a new or different challenge." R. at 1036. He also remarked on Ampe's low average scores in focus, attention, concentration, and executive functioning.

On October 30, 2015, Ampe appealed Prudential's denial, submitting an affidavit as to his condition, his job performance evaluations from 2010 to 2014, updated records from Dr. Herman, and the reports of Dr. Berkowitz and James Parker, CVRP, CRC, the expert who had evaluated the vocational aspects of Ampe's SSA disability claim. After examining Ampe's appeal submissions, Dr. Richard Day, Prudential's Chief Medical Officer, took issue with Dr. Khumbani's diagnosis of post-concussion syndrome. While acknowledging that the prior testing had generally corroborated Ampe's reported symptoms, Dr. Day noted that, given the minor nature of Ampe's head injury, and the passage of time since his fall, other factors could be responsible for Ampe's persisting symptoms. Dr. Day recommended that Dr. Khumbani's report be reviewed by a second neuropsychologist before a final decision was made on the appeal.

In response to Dr. Day's recommendation, Prudential retained Dr. Kristin Fiano, a board-certified neuropsychologist, to conduct a file review of Ampe's case. Dr. Fiano concluded that "overall, the record does not provide compelling support for psychological or cognitive symptoms." R. at 1079-

6

1082. Dr. Fiano criticized Dr. Berkowitz for failing to perform appropriate validity testing.[5] She also noted that he did not administer "personality measures (such as the MMPI) to evaluate more thoroughly how potential psychological factors impacted cognitive symptoms." R. at 1082. In evaluating Dr. Khumbani's 2012 neuropsychological findings, Dr. Fiano opined that they revealed a pattern of strengths and weaknesses that could not be explained by a concussion. She also criticized Dr. Khumbani for conducting only one validity test.

Based on Dr. Fiano's file review,[6] Prudential recommended that MIT affirm the decision to deny Ampe's LTD claim. MIT agreed. The subsequent denial letter stated in relevant part:

> Overall, there is no evidence of functional impairment or the need for any restrictions and/or limitations as of January 31, 2015 forward from either a cognitive, psychological, or physical perspective. . . . [T]he work-up data have been noted to reveal no significant abnormalities that would support a neurological process that would be impairing Mr. Ampe's work abilities to any degree. . . . [N]europsychological testing performed in 2012 revealed a pattern of strengths and weaknesses that would not be explained by a concussion.

---

[5] Dr. Fiano evidently was referring to what she perceived as a lack of internal testing designed to detect whether or not Ampe was malingering.

[6] Dr. Fiano did not personally examine Ampe. Nor did she address his reported symptoms of fatigue and headaches, as these fell outside what she deemed her area of specialty. R. at 1081.

7

> [T]he consultative exam by Dr. Berkowitz did not include validity measures, and given the unexpected decline in scores from 2012, the data has not been considered to be reliable. . . . [W]hile Mr. Ampe's treatment provider, Dr. Herman, has endorsed his support for Mr. Ampe's disability status, the opinion of total disability from gainful employment is not adequately supported by the medical data, as currently available.

R. at 1303-1304.

On June 8, 2016, Ampe appealed the second denial. On June 21, 2016, Ampe submitted to Prudential an April 2016 neuropsychological evaluation conducted by Dr. Kaaren Bekken. Dr. Bekken administered Ampe a battery of fifteen tests, including validity tests specifically designed to detect malingering.[7] Ampe further supplemented the record with two recent office visit notes from Dr. Herman. In Dr. Bekken's judgment, Ampe "was very cooperative and willing to persevere on tests, even when experiencing difficulty." R. at 1145. Dr. Bekken concluded that Ampe's prognosis was "poor," finding that "the pattern of deficits indicate[] that he is permanently disabled from . . . gainful employment." R. at 1146. She further commented:

---

[7] Dr. Bekken found that "careful study of the pattern of answers reveals no evidence of malingering or 'faking bad', a feat that would require a great deal of sophistication about neuropsychological testing to carry off successfully. There was no evidence of failing simpler items and passing border items, which is often seen when one is putting in insufficient effort in the service of trying to amplify deficits. . . . A comparison of performance on a 15-word forced recognition measure that is often used to detect problems with effort, recognition of list items was adequate. Reliable digit spam was also passed." R. at 1145.

8

> Mr. Ampe presents s/p a traumatic brain injury resulting in a persistent post concussive syndrome. In addition to cognitive declines, significant debilitating fatigue is present. The impact of these events has rendered Mr. Ampe permanently disabled from work for multiple reasons. Physically, he would be unable to meet the responsibilities, given his excessive and prolonged fatigue after even minimal cognitive exertion. Cognitively, his absolute and relative deficits (as mentioned above, with the majority of scores falling in or below the Average range for age) indicate [*sic*] that he would be unable . . . to effectively meet the demands of a Senior Development and Test Engineer. In fact, the pattern of deficits indicates that he is permanently disabled from such gainful employment as a result of his injury.

*Id.*

In response to the appeal, Prudential asked Dr. Fiano to conduct a further file review. In her supplemental report, Dr. Fiano challenged Dr. Bekken's reliance on "outdated" scientific literature supporting the theory that mild traumatic brain injury could produce enduring, cognitive defects in a small subset of patients. In Dr. Fiano's opinion, there is no convincing medical science supporting Dr. Bekken's suggested diagnosis of post-concussion syndrome. Dr. Fiano also revisited the subject of validity testing, stating that Dr. Bekken had conducted only one validity such test, and noting that Ampe's performance had varied from superior to low-average, which Dr. Fiano believed suggested malingering. Finally, Dr. Fiano questioned whether Ampe's symptoms were psychosomatic in origin, rather than based on a cognitive disorder.

9

Based on Dr. Fiano's report, Prudential again recommended that MIT deny Ampe's appeal. MIT agreed with the recommendation. In its final rejection letter, dated October 7, 2016, Prudential stated in relevant part:

> We acknowledge your report that Mr. Ampe underwent Neuropsychological Testing with Kaaren Bekken, Ph.D who concluded that he is permanently disabled from work; however it is maintained the information does not support impairment in Mr. Ampe's cognitive abilities. The new information provided indicates Dr. Bekken administered one performance validity measure, and Mr. Ampe's score has raised concerns as it relates to validity. This single measure was also noted as insufficient given prior changes in scores Mr. Ampe had shown on previous testing, which had revealed declined scores from his 2015 evaluation arranged by the Social Security Administration, when compared to the first evaluation in 2012. Additionally, it has been noted Mr. Ampe's varying performance is not consistent with a neurological condition, including that of a concussion, and there is no expectation that cognitive symptoms related to a TBI would worsen. Dr. Bekken's testing also did not include a personality measure in order to assess the potential of other factors influencing Mr. Ampe's presentation, such as somatization, which had also been lacking in the prior two evaluations available for review. Overall, the information available does not provide any valid or reliable evidence supportive of any level of cognitive dysfunction, nor any level of impairment from a physical or psychological perspective, impacting Mr. Ampe's functionality from January 31, 2015, forward.

R. at 1346.

## DISCUSSION

The standard of review in ERISA cases differs from that of an ordinary civil case, where summary judgment is used to screen out lawsuits that raise no trial-worthy issues. *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510,

10

417 (1st Cir. 2005). In an ERISA context, "summary judgment is merely a vehicle for deciding the case." *Bard v. Bos. Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006). The court does not consider affidavits and other evidence submitted by the parties, but instead reviews the denial of ERISA benefits based "solely on the administrative record." *Id.* Neither party is entitled to factual inferences in its favor. *Id.* "The district court sits more as an appellate tribunal than as a trial court" in determining whether to uphold the insurer's benefits decision. *Leahy v. Raytheon Co.* 315 F.3d 11, 18 (1st Cir. 2002).

This does not mean that the court applies no standard of review at all. As observed previously, *see* fn. 3 *supra*, in this case an arbitrary and capricious standard of review applies. This standard is highly deferential, *see Madera v. Marsh USA, Inc.*, 426 F.3d 56, 64 (1st Cir. 2005), but it is "not a rubber stamp." *Wallace v. Johnson & Johnson*, 585 F.3d 11, 15 (1st Cir. 2009). As the First Circuit has noted, even under this deferential standard, a reviewing court "asks whether a plan administrator's determination 'is plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record.'" *Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term*

*Disability Plan*, 705 F.3d 58, 61 (1st Cir. 2013) (quoting *Leahy,* 315 F.3d at 17).

What concerns the court in this case is the appearance that Prudential gave conclusive weight to Dr. Fiano's opinions based on her file review without giving any substantive consideration to the records and opinions of Ampe's treating physician (Dr. Hermann) and the doctors who had examined Ampe to evaluate his neuropsychological symptoms (Dr. Khumbani, Dr. Berkowitz, and Dr. Bekken). In its final denial letter, Prudential made several conclusory statements that appear unanchored in the medical records. Prudential, for example, criticized Dr. Bekken's validity testing despite her careful explanation of why the testing convinced her that Ampe was not malingering. The observation that "[t]his single measure [sic] was also noted as insufficient given prior changes in scores Mr. Ampe had shown on previous testing, which had revealed declined scores from his 2015 evaluation arranged by the [SSA], when compared to the first evaluation in 2012," can fairly be read to say the opposite of what Prudential presumably meant. The reference to somatization is also troubling. Somatization (also known as Briquet's syndrome) is a discredited clinical diagnosis, derived from the theory that acute anxiety or stress can precipitate real or, more often, imagined physical symptoms in a patient. The reference to

somatization underscores the extent to which Prudential's decision relied on Dr. Fiano's personal skepticism regarding the validity of any diagnosis of post-concussion syndrome, and on her apparent, if not overtly stated, conviction that Ampe was a malingerer. While the court is not in a position to address in any definitive fashion the medical validity of post-concussion syndrome as a diagnosis, there is enough support in the medical literature documenting its existence so as to make a denial of LTD benefits based on one skeptical doctor's file review open to question, especially where three examining specialists and a treating physician at different times came to a contrary conclusion.[8]

A second, and perhaps more critical deficiency in Prudential's benefit denial was its failure to analyze Ampe's conceded limitations against the demands of his occupation as an electrical engineer. A benefits determination is not "'reasoned' when the [claims] administrator sidesteps the central inquiry . . . [of] whether the claimant [is] . . . able to perform the material duties of [his] own occupation." *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 380 (1st Cir. 2015). Plan administrators may not dismiss evidence merely because it is subjective, but must meaningfully address why

---

[8] *See, e,g.*, the literature cited in: https://en.wikipedia.org/wiki/Post-concussion_syndrome.

reported symptoms either false or exaggerated or do not impede a claimant's ability to work. *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 487 (2d Cir. 2013); *see also Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 396 (7th Cir.2009) (finding that defendant failed to sufficiently explain the reasons for its denial of disability benefits as required by 29 U.S.C. § 1133, where "neither the initial termination letter nor the subsequent letter denying [the claimant's] appeal explained why the reviewer chose to discredit the evaluations and conclusions of [the claimant's] treating physicians") (emphasis in original). In this context, Prudential failed to meaningfully address and properly weigh Ampe's complaints of severe headaches and fatigue. (Dr. Fiano specifically disclaimed any consideration of these complaints as lying outside her area of expertise). As underscored by Judge Selya in *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 380 (1st Cir. 2015), "medical evidence is only part of the equation. To assess a claimant's ability to perform his own occupation, a decisionmaker must be aware of, and apply, the requirements of the occupation." Here, there is no record evidence that Prudential (unlike the SSA) engaged in an analysis of the impact of Ampe's limitations, whether subjective or substantiated by the clinical examinations and objective testing, on his ability to perform the work

of a Senior Development and Test Engineer.[9]  *See Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 854 (3d Cir. 2010) (citing *Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613, 619 (6th Cir. 2006) (finding a decision could not be considered "reasoned" where there was no discussion of claimant's duties or her ability to complete them in light of the various diagnoses).

CONCLUSION

Where a claims administrator abuses its discretion, the court may either award benefits to the claimant or remand the decision to the administrator. *See Cook v. Liberty Life Assurance Co.*, 230 F.3d 11, 24 (1st Cir. 2003). Where, as here, the record does not *compel* the conclusion that Ampe is disabled – or for that matter, the opposite – a more considered examination of the medical evidence on remand is the appropriate course. *Buffonge*, 426 F.3d 20 at 31.

ORDER

---

[9] Prudential summarily dismissed the SSA's Vocational Expert's findings that Ampe was unable to perform the essential functions of his occupation with the circular logic that for its part, "no formal vocational assessment has been completed, as no restrictions and/or limitations in Mr. Ampe's functional capacity are medically supported, from a physical, cognitive, or psychological standpoint."

15

For the foregoing reasons, the cross-motions are <u>DENIED</u> and the case is <u>REMANDED</u> to the plan administrator for further proceedings consistent with this opinion.

        SO ORDERED.

        <u>/s/ Richard G. Stearns           </u>
        UNITED STATES DISTRICT JUDGE